UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-21288-CIV-MARTINEZ/DUBÉ

BEATRIZ QUINTANA SANCHEZ,

    Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before this Court on the Motion for Summary Judgment filed by the Plaintiff (D.E. #16) and the Motion for Summary Judgment filed by the Defendant (D.E. #19) pursuant to an Order of Reference entered by the Honorable Jose E. Martinez, United States District Judge. The issue before this Court is whether the record contains substantial evidence to support the denial of benefits to the Plaintiff, Beatriz Quintana Sanchez (hereinafter "Sanchez" or "Plaintiff").

### I. FACTS

On August 10, 2004, the Plaintiff filed an application for disability insurance benefits alleging a disability onset date of April 9, 2003. (R. 30, 39).[1] The application was denied initially and on reconsideration. (R. 19-20). An initial hearing was held on August 8, 2006. (R. 348-381). Following the hearing, the ALJ issued a decision denying the request for benefits. (R. 9-18). A request for review filed with the Appeals Council was denied. (R. 4-6).

---

1 All references are to the record of the administrative proceeding filed as part of the Defendant's answer. Although there is no copy of the Plaintiff's application within the record, a letter confirming receipt of same was provided by the Social Security Administration.

The Plaintiff, aged 45 at the time of the hearing, testified that she completed high school and was last employed on April 6, 2003, as a temporary executive secretary for The Children's Trust. (R. 352). She also testified that she could not work as a result of pain in her lumbar and lower back right at her waistline. Sanchez stated that the pain is a "sharp pain" which feel like "somebody is stabbing me with a screwdriver." (R. 353). The Plaintiff testified that she cannot drive for more than ten minutes because her foot "falls literally asleep" as a result of the pain radiating from her back down to her legs. (R. 353-354). Sanchez stated that she has had five epidurals, two medial nerve block branches and a bilateral nerve block. (R. 354).

According to the Plaintiff, she was doing physical therapy prior to the first epidural injection but the pain was so "terrible" that she could not get out of bed the following day. The Plaintiff stated that the pain runs down the outside portion of her left leg and the intensity is worse when she sits down. (R. 355). Additionally, the Plaintiff stated that she gets relief by laying down with her legs up or sideways while wearing an orthopedic brace. (R. 356).

Sanchez stated that she has been suffering from depression since 2003 and that the depression makes her cry for no reason, and feel useless, inadequate and not "a good mother half the time." She stated that she takes Lexapro for her depression, but that it does not help. (R. 359). The Plaintiff testified that she has insomnia and has great difficulties sleeping at night. (R. 360). The Plaintiff states that her back problems started when she was giving birth to her son in 1997. (R. 361). Additionally, Sanchez said that she has several side effects from her medication such as: excessive seating, being slowed down, blackouts and difficulty speaking. (R. 362).

The Plaintiff stated that when her son does not have school she will wake up at 12:30 or 1:00 p.m., "if I slept the night before." When her son does have school she wakes up with the assistance

of an alarm clock at 5:30 a.m. Before getting out of bed, Sanchez stretches her legs for 30 minutes and takes her medications, however, sometimes requires her son's assistance. Sanchez then has coffee, takes additional medications, eats and sits down for "a little while." (R. 363). The Plaintiff testified that she does the laundry but her son carries the basket and removes the clothing from the dryer. She also stated that when she goes grocery shopping the following day she is unable to function because of severe pain. (R. 363). The Plaintiff does the dishes but must alternate between standing and sitting while doing so. She stated that she does not cook unless it involves putting potatoes in the microwave. According to the Plaintiff, her friends no longer visit as "they don't like seeing me like this." (R. 364).

The Plaintiff stated that she typically falls asleep between 1:30 and 3:00 a.m. and when asked if she sleeps through the night, responded "I don't sleep well." (R. 364). Sanchez testified that she can sit between 10-15 minutes before having to switch positions. (R. 365). Additionally, she stated that she cannot bend or squat and that she feels dizzy "all the time." (R. 366).

According to Sanchez, she cannot lift and carry, and her son must bring her shoes to her, although she can put them on herself except in instances where her feet are swollen. (R. 367). The Plaintiff stated that on a scale of 1 to 10 her pain level on a typical day is a 9 and on a good day her pain level is a 5 or 6. Sanchez added that her pain has gotten worse with time. (R. 368).

The Plaintiff stated that her mother and sister live next door but they do not see each other as her mother "hates to see me like this." Sanchez testified that during the day she watches the news, reads or sews school uniforms for her son. Additionally, because of her medications she usually takes a nap each day. (R. 369-370).

In addition to the Plaintiff's testimony, a vocational expert, Nicolas Fidanza testified at the

hearing. The VE described the Plaintiff's past relevant work as a collections clerk, general secretarial position, file clerk and admissions clerk. (R. 374-375). The VE stated that the collections clerk job is sedentary with an SVP of 5; the general secretarial position is sedentary with SVP 6; the file clerk position is light with SVP 3; and the admissions clerk position is sedentary with SVP 4 (R. 374-375). The ALJ then asked the VE the following hypothetical question:

> Q   Hypothetical number one, assume a person of her age and education at the light with occasional stooping, crawling and bending. Any jobs in the regional or national economy that person could perform?
>
> A   All past relevant work.

(R. 375). The ALJ then added the following restrictions:

> Has a mental RFC of mild for activities of daily living with little or no impairment there, mild for social functioning, able to get along with coworkers and general public. Mild concentration, persistence and pace but would have difficulties with detailed or complex 40 to 50 percent of a day but could do simple, repetitive tasks, be no episodes of decompensation.

(R. 375). The VE concluded with those restrictions, the Plaintiff could return to her past relevant work as a file clerk. (R. 375). Finally, the ALJ then asked the a final hypothetical question wherein the physical restrictions remained the same but the mental restrictions were changed as follows:

> ... For a mental RFC mild for activities of daily living, meaning little or no impairment there, mild for social functioning, able to get along with coworkers and general public, would be moderately impaired for concentration, persistence and pace 40 to 50 percent in a day as to detailed and complex instructions and 40 to 50 percent as to simple, repetitive tasks and no episodes of decompensation. Any jobs in the regional or national economy that person could perform?

(R. 376). The VE opined that with the added restrictions the Plaintiff would be unable to work. Upon being questioned by the Plaintiff's attorney, the VE stated that if the Plaintiff's testimony were

4

true than she would not be able to work. (R. 376). Additionally, the VE stated that when using the RFC of either Dr. Patin[2] and Dr. Schwartz, the Plaintiff would be precluded from any type of employment. (R. 377-378).

In addition to the testimony presented at the hearing, medical records were submitted to the ALJ. On February 21, 2004, the Plaintiff had an MRI taken of the lumbar spine. (R. 126-128). The test revealed as follows:

> L2-L3, L3-L4 and L4-L5, mildly advanced discogenic disease accounting by generalized disc bulges extending outward into the inferior foraminal recesses without nerve root impingement. There is ligamentum infolding and bulges producing a multifactorial mild narrowing of the L2-L3, L3-L4 and L4-L5 central spinal canal.

(R. 128). On April 7, 2004, the Plaintiff was seen by Dr. Manuel A. Alzugaray with complaints related to lower back pain which radiated down her right lower side to her calf. Examination of the lower spine revealed tenderness from L1 to S1; minimal spaciticiy Flexion 70 degrees with pain; extension less than 10 degrees with pain; right and left flexion less than 20 degrees with pain; and straight leg raising positive in the right at 45-50 degrees of elevation. (R. 293). Dr. Alzugaray analyzed the previously taken MRI as "some arthritis changes. No herniated disc." His diagnosis was "low back syndrome." (R. 293).

On August 19, 2004, the Plaintiff was seen by Dr. Andres Restrepo with complaints of chronic low back pain. (R. 94). The Plaintiff reported to Dr. Restrepo that the pain increased when walking and sitting for long periods of time; but decreases when laying down flat. (R. 94-95). Examination of her back revealed paralumbar muscle tightness, no pain to percussion over the spinal processed, range of motion full to flexion, extension and rotation, no straight leg raising, and

---

[2] Incorrectly spelled in the transcript as "Patten."

distraction test negative. Neurologic testing revealed full strength in her upper and lower extremities. (R. 96). Dr. Restrepo diagnosed the Plaintiff as having minimal degenerative disease and he recommended physical therapy, an increase of the Plaintiff's dosage of Naproxen, placing her on Flexeril, and having her continue using a heating pad. (R. 97).

The Plaintiff returned to Dr. Restrepo for a follow-up visit on October 6, 2004. The Plaintiff reported that she had not been taking the Flexeril but that she obtained partial improvement from the Naproxen and physical therapy. Additionally, she reported to Dr. Restrepo that she was again experiencing low back pain after moving a couch the previous week. (R. 166). Dr. Restrepo diagnosed the Plaintiff with degenerative disc disease and recommended her to continue physical therapy and go for a series of epidural injections. (R. 164, 166).

On October 20, 2004, Dr. Restrepo sent a letter to the office of Disability Determinations. (R. 84-85). In the letter he stated that the Plaintiff's diagnosis was mild discogenic disease at multiple lumbar levels; that his course of treatment provided partial improvement, although pain still existed; that he could not declare her disabled as she must still have interventional pain management and neurosurgical consultation; and that according to the Plaintiff, she could not stand or sit for long periods of time. (R. 84-84). He further stated that she may perform activities which allow her to rest every hour from sitting and that she cannot lift objects which are heavier than 40 pounds. (R. 85).

On November 2, 2004, a Physical Functional Capacity Assessment was completed. (R. 102-109). The Plaintiff was found to be capable to occasionally lift and/or carry 50 pounds, and frequently lift and/or carry 25 pounds. Additionally, the assessment found that the Plaintiff could sit, stand, and/or walk (with normal breaks) 6 hours in an 8 hour workday and had no limitations in pushing and/or pulling. (R. 103). The assessment found that the Plaintiff had no postural,

manipulative, visual, communicative or environmental limitations. (R. 104-106).

On October 11, 2004, the Plaintiff was seen by Dr. Mirentxu Leiva for a psychological evaluation. (R. 99-100). The Plaintiff reported "feeling sad, increased crying spells and insomnia." (R. 99). The Plaintiff drove herself to the examination. Additionally, mental examination revealed that the Plaintiff was appropriately dressed and groomed, and appeared to be her stated age. Further, Dr. Leiva opined that the Plaintiff did not seem to be in acute emotional distress and was cooperative and attentive. The Plaintiff's speech was normal in tone and rate, and the Plaintiff had difficulty walking, standing and initiating "locomotion." Her mood and affect were depressed and she indicated being sad and tearful. The Plaintiff had no suicidal or homicidal ideation, nor any delusions or hallucinations. Her flow of thought was reported as "logical." Additionally, the Plaintiff's attention and concentration were adequate as she recalled digits forward and backwards; orientation was full; immediate and short-term memory were fair, and she recalled two of the three familiar items; and remote memory was adequate. Computation was poor; abstract abilities, judgment and fund of information were adequate; and she appeared to have an average range of intelligence. (R. 100). Dr. Leiva gave the following diagnostic impression:

>     Axis I:     311 Depressive Disorder NOS
>     Axis II:    Deferred
>     Axis III:   A history of chronic back pain, by self report
>     Axis IV:    A history of poor finances and unemployment
>     Axis V:     Current GAF = 60

(R. 100).

On November 23, 2004, Dr. Franklin Pimentel sent a letter to the Social Security Administration which read, in pertinent part, as follows:

> I as her physician am completely beside myself. I have witnessed a
> woman who has diminished from a vibrant and strong individual to a

> crippling person, she has stated to me and I have seen her crying due to the pain she is in, her mental and physical state is saddening. She cannot sit for long periods of time and has tremendous difficulty in walking due to her back problems. She [h]as stated to me that her depression is not only for the pain she is in but for the state of mind this back problem is causing her. She has confided in me that the doctors and physical therapist she sees at Jackson Memorial Hospital Rehabilitation Center, have stated that the physical therapy may take up to (5) five years to correct her issue, unless surgery is performed. But yet she still has to follow the steps given to her, which are more stressing to my patient.

(R. 125).

On December 3, 2004, the Plaintiff was examined by Dr. Fernando Branco. (R. 147-148).

Physical examination revealed as follows:

> This is an alert, oriented lady. She is overweight. Neurological examination: On reflexes, biceps 1+, brachioradialis 1+, knees 2+ bilaterally, ankle 2+ on her right, left abolished. Negative Hoffmann's, negative clonus. There is severe tenderness over the lumbar and thoracic spine.

(R. 147). Dr. Branco's assessment of the Plaintiff was that she had degenerative disk disease at L2-3, L3-4 and L4-5 with minimal bulging in the same area. Additionally, he reported the possibility of radiculopathy and/or myofascial pain syndrome. His plan was for the Plaintiff to wear a Warm n' Comfort brace; a TENS unit for physical therapy; Medrol pack; to take Celebrex 200 mg p.o. b.i.d.; and an EMG to determine whether there is radiculopathy in the left lower extremity. (R. 147).

On December 16, 2004 and January 26, 2005, the Plaintiff was given epidural steroid injections on the lumbar spine. (R. 152, 156).

On July 1, 2005, the Plaintiff reported to Dr. Robert Schwartz with complaints of chronic back pain. (R. 224-225). Examination of the lower back revealed some restriction of forward flexion; no evidence of impingement syndrome; motor strength as appropriate; and deep tendon reflexes are

8

symmetrical. Dr. Schwartz's assessment was: chronic low back pain; depression, possible somatoform disorder; and consider obsessive-compulsive disorder. (R. 224). The Plaintiff was prescribed Tofranil 25 mg. and was started on Medrol Dosepak. (R. 225).

On July 27, 2005, the Plaintiff had a follow-up visit with Dr. Schwartz. The Plaintiff reported being in "significant pain" because she had been "lifting more than she can normally carry." Dr. Schwartz did not perform a physical examination, refilled the Plaintiff's Tofranil prescription and gave her a new prescription for Toradol. (R. 215).

A neurological examination perform by Dr. Schwartz on September 14, 2005, was "completely unremarkable". (R. 233). A September 29, 2005 MRI revealed: "Although there is congenial stenosis and a few sites of disc bulge, there does not appear to be any significant canal or foraminal compromise on this study. (R. 340-340A).

On April 18, 2006, the Plaintiff was seen by Dr. Dennis Patin for chronic back pain. (R. 264-266). Examination revealed that the Plaintiff had antalgic gait, but was able to perform heel and toe walking. Additionally, range of motion in the lumbar spine was "intact" with both flexion and extension; there was axial lumbar tenderness to palpation along with the right sacroiliac joint; and positive Patrick sign on the right. (R. 265). Dr. Patin's assessment was that the Plaintiff suffered from: chronic low back pain due to probably facetogenic disease; right sacroiliac joint dysfunction; and meralgia parsesthetica in the left lower extremity. (R. 265).

On May 8, 2006, Dr. Schwartz completed a Medical Assessment of Ability to do Work Related Activities. (R. 195-198). The assessment stated that the Plaintiff could lift up to 5 pounds due to persistent back pain; that the Plaintiff could sit for 10-20 minutes; and walk for 10 minutes. (R. 195). The assessment stated that the Plaintiff could never climb, balance, stoop, crouch, kneel,

or crawl. Additionally, the assessment noted that the Plaintiff's impairment affected her ability to reach, push and pull, but did not affect her ability to handle, feel, see, hear, or speak. (R. 196). The assessment did not place any environmental restrictions on the Plaintiff and stated that she would not be able to perform sedentary or light work. (R. 197-198).

Additionally on May 8, 2006, Dr. Schwartz completed a Medical Assessment of Ability to do Work-Related Activities (Mental) in which he opined that Plaintiff had "poor or none" ability to: follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisor, deal with work stresses, function independently, or maintain attention/concentration. (R. 199). The assessment also stated that the Plaintiff's ability to: understand, remember and carry out complex job instructions; understand, remember and carry out detailed, but not complex job instructions; and understand, remember and carry out simple job instructions were all "poor or none." Further, the Plaintiff's ability to maintain personal appearance and demonstrate reliability were noted as "good"; and her ability to behave in an emotionally stable manner and relate predictably in social situations were deemed "fair." (R. 200).

On May 15, 2006, Dr. Schwartz completed a Lumbar Spine Residual Capacity Questionnaire. (R. 190-194). The Plaintiff's diagnosis was listed as chronic pain syndrome which was unlikely to improve. (R. 190, 192). The questionnaire stated that the Plaintiff's impairments have lasted or could be expected to last for 12 months; that the Plaintiff could not walk a city block; could sit for 15 minutes continuously and stand between 15-20 minutes continuously. (R. 192). Additionally, it stated that she could use her hands 30% of the time; fingers 50% of the time; and her arms for reaching 15% of the time. (R. 194).

On July 24, 2006, Dr. Patin completed a Physical Medical Assessment. (R. 325-328). The

assessment stated that the Plaintiff could lift up to 7 pounds occasionally and 5 pounds frequently; the Plaintiff stand and/or walk, and sit 2-3 hours in an 8 hour work day. (R. 325-326). The assessment stated that the Plaintiff could never climb, stoop, crouch, or crawl and occasionally balance or kneel. Additionally, the assessment noted that the Plaintiff's impairment affected her ability to reach, push and pull, but did not affect her ability to handle, feel, see, hear, or speak. (R. 326). The Plaintiff had the environmental restriction for moving machinery. (R. 327). The assessment stated that the Plaintiff states that she cannot perform sedentary or light work. (R. 328).

After a hearing and review of the record, the ALJ issued an opinion finding that the Plaintiff had the impairments of lumbar degenerative disc disease and depression which are considered severe. The ALJ further found that these impairments did not meet or medically equal the listed impairments in 20 CFR Part 404, Subpart P, Appendix. (R. 14). The ALJ determined that the Plaintiff retained the residual functional capacity to return to her previous work. As such, the ALJ found that the Plaintiff was not disabled within the meaning of the Social Security Act at any time through the decision date. (R. 18).

## II. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Kelley v. Apfel</u>, 185 F.3d 1211, 1213 (11th Cir. 1999); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997).

In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Foote v. Chater, 67 F.3d 1553 (11th Cir. 1995); Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988). The reviewing court must also be satisfied that the decision of the Commissioner correctly applied the appropriate legal standards. See, Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987). The court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence preponderates against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. See, Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Baker v. Sullivan, 880 F.2d 319 (11th Cir. 1989).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the conclusions of law found by the Commissioner, including the determination of the proper standard to be applied in reviewing claims. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. Cornelius v. Sullivan, 936 F.2d 1143, 1145-1146 (11th Cir. 1991).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. See, 20 C.F.R. section 404.1520; 20 C.F.R. section 416.920 (a)-(f).

The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. section 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If such a finding is not made, then a finding of non-disability results, and the inquiry

ends. 20 C.F.R. section 404.1520(c).

At step three, the ALJ compares the claimant's severe impairments to those in the listing of impairments. 20 C.F.R. section 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. See, Gibson v. Heckler, 762 F.2d 1516, 1518, n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. section 404.1520(d).

Step four involves a determination of whether the impairments prevent the claimant from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show, at step five, that there is other work available in the national economy which the claimant can perform. 20 C.F.R. section 404.1520(e)-(f).

The claimant bears the initial burden of proving that she is unable to perform previous work. See, Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991). The inability to perform previous work relates to the type of work performed, not to merely a specific prior job. See, Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986).

.In the present case, the ALJ found, that based on the record in its entirety, the Plaintiff retained the residual functional capacity to perform her past relevant work as a file clerk and was not under "disability" as defined in the Social Security Act at any time through the date of the decision as defined by 20 CFR § 404.1520(f). (R. 18).

The Plaintiff's first point of contention is that the ALJ erred in his assignment of weight to the

Plaintiff's treating physicians. The opinion of a treating physician is to be given substantial weight in determining disability unless good cause is shown. Good cause is shown when:

> 1) treating physician's opinion was not bolstered by the evidence;
>
> 2) evidence supported a contrary finding; or
>
> 3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons.

Phillips v. Barnhart, 357 F. 3d 1232, 1240-1241 (11th Cir. 2004). The treating physician's opinion is entitled to more weight than a non-treating physician. Ryan v. Heckler, 762 F. 2d 939, 942 (11th Cir. 1985).

The ALJ assigned the following weight to the physicians who examined the Plaintiff:

> The opinion of Dr. Leiva is given more weight because she had the opportunity to examine the claimant. In accordance with § 404.1527, the opinions of claimant's treating sources were considered. The opinion of Dr. Branco and Dr. Restrepo are given more weight because their opinions are corroborated by objective evidence and clinical findings. The opinions of Dr. Schwartz and Dr. Pimentel are given less weight because their opinions are inconsistent with the treatment notes and are not supported by objective evidence, clinical findings and her activities, as discussed above. The opinion of Dr. Patin with respect to clinical findings is given more weight because it was based upon examination. However, Dr. Patin's opinion regarding claimant's ability to do work related activities is given less weight because it was based on claimant's reported limitations and symptoms, which are inconsistent with objective evidence and her activities.

(R. 17-18). The Plaintiff specifically contends that the ALJ accorded improper weight to two of the Plaintiff's treating physicians, Drs. Schwartz and Pimentel.

This Court does not agree. The ALJ correctly explained that despite Dr. Schwartz's assertion that the Plaintiff had "poor or no ability in making occupational adjustments or performance adjustments and medication side effects diminished her normal functioning," the doctor's own

treatment notes and objective evidence did not comport same. (R. 17). Namely, the ALJ stated that Dr. Schwartz noted that neurological examination was completely unremarkable; there was no evidence of impingement syndrome; motor strength was appropriate; deep tendon reflexes were symmetrical; she was not in acute distress, was smiling, able to laugh easily and did not appear overly depressed. (R. 17).

The ALJ also reviewed the results of two MRIs. The first MRI revealed "mildly advanced discogenic disease with generalized disc bulges at L2-L5 without nerve root impingement and multifactorial mild narrowing of the central spinal canal. While the second MRI revealed congenital stenosis and multilevel disc bulges without any significant canal or foraminal compromise. (R. 16). The ALJ noted that the EMG study revealed no signs of radiculopathy or neuropathy. (R. 16).

The ALJ also compared these test results along with Dr. Schwartz's own treatment notes to that of the Plaintiff's other treating physicians such as Dr. Restrepo. Dr. Restrepo, as the ALJ noted, stated that the Plaintiff had the following:

> ... positive paralumbar muscle tightness that does not decrease her range of motion, she is able to squat and walk on her toes and heels, she has no motor deficits and her deep tendon reflexes are normal (Exhibit 1F/6) Dr. Restrepo opined claimant has normal gait, normal muscle strength in upper and lower extremities, no neurological or motor deficits, symmetrical reflexes and normal mental status.

(R. 16). The ALJ also pointed to the Plaintiff's refusal to take pain medication, advising that pain had decreased with treatment and a March 2006 progress note from Jackson Memorial Hospital wherein the Plaintiff stated that she had taken medication "intermittently;" that a limited examination was performed as the Plaintiff did not want to wait; and that a neurological evaluation was not warranted based on her previous MRI. (R. 16).

The ALJ then pointed out that Dr. Patin noted as follows:

15

> ... claimant has an antalgic gait, positive Patrick sign on the right, lumbar tenderness and numbness along the thigh on palpation, but she is able to perform heel and toe walking, her lumbar range of motion is intact with both flexion and extension and straight leg raising is negative bilaterally. (Exhibit 17 F/4). In Exhibit 20F, Dr. Patin completed the medical assessment of ability to do work related activities and noted claimant reported she is unable to perform sedentary work and she is unable to stoop, crouch, climb or crawl.

(R. 17). The ALJ rejected this assessment as it was inconsistent with Dr. Patin's own examinations and was based on the Plaintiff's subjective complaints rather than objective evidence and clinical testing.

The Court finds that the ALJ did not err in assigning less weight to the opinions of Drs. Schwartz and Patin, and that the decision was in compliance with Eleventh Circuit standards and supported by substantial evidence. Additionally, this Court does not find error with the ALJ's determination that the Plaintiff could return to her past relevant work as a file clerk.

The Plaintiff's second point of contention is that the ALJ erred by ignoring the testimony of the vocational expert.

Testimony from a vocational expert is highly valued and commonly obtained in order to establish the availability of suitable alternative jobs for disability claimants. Holley v. Chater, 931 F. Supp. 840, 851, (S.D. Fla. 1996). Further, the ALJ has the obligation of developing a full and fair record regarding the vocational opportunities available to a claimant. Foote v. Chater, 67 F. 3d 1553, 1558 (11th Cir. 1995), citing Allen v. Sullivan, 880 F. 2d 1200, 1201 (11th Cir. 1989). In the present case, however, the ALJ ended her evaluation at step four and although a vocational expert may be used at step four, first, the claimant bears the initial burden of proving that she is unable to perform her previous work. See, Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991). The inability to perform previous work relates to the type of work performed, not to merely a specific

prior job. See, Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986).

As noted above, the testimony of a vocational expert, although helpful, is not required at step four of the sequential process. The ALJ went through a thorough evaluation of the record, including the objective medical evidence, the opinions of both the treating and non-treating physicians, and the Plaintiff's testimony. Upon his review, the ALJ concluded that the Plaintiff had the following RFC:

> ... to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting of ten pounds. The claimant is able to stand and/or walk for 6 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday. Because of back pain and limitations from obesity, claimant is able to perform stooping, crawling and bending on an occasional basis. Due to depression and chronic pain, the claimant's mental residual functional capacity is restricted by a mild degree of limitation with restrictions of activities of daily living, a mild degree of limitation with difficulties in maintaining social functioning and a mild degree of limitation with difficulties in maintaining concentration, persistence or pace, and the cumulative effect causes a 40-50% decrease in the ability to understand, follow and carry out detailed and complex instructions and a 10% decrease in the ability to understand, follow and carry out simple and repetitive tasks. Occasionally is defined as occurring from very little up to one-third of the time, or approximately 2 hours in an 8-hour workday. Frequent is defined as occurring from one-third to two thirds of the time or approximately 6 hours in an 8-hour workday.

(R. 15).

The Plaintiff contends that the ALJ erred by not accepting the VE's responses to hypothetical questions using and RFC prepared by Drs. Schwartz and Patin. This Court does not agree. As this Court stated above, substantial evidence supports the ALJ's assignment of weight to the Plaintiff's various treating physicians. Further, the ALJ was not required to elicit the testimony of a vocational expert as he determined at step four that the Plaintiff could return to her prior employment. Finally, posed with a hypothetical question containing the same restrictions ultimately placed on the Plaintiff by the ALJ in his RFC determination, the VE responded that the Plaintiff would be able to return to

her past relevant work as a file clerk. As such, the Court finds that the ALJ's decision was supported by substantial evidence and it is this Court's recommendation that the decision of the ALJ be affirmed.

### III. CONCLUSION AND RECOMMENDATION

Based on the foregoing, this Court finds that the decision of the ALJ was supported by substantial evidence and that the correct legal standards were applied. Therefore, it is the recommendation of this Court that the decision of the Commissioner be affirmed. Accordingly, the Motion for Summary Judgment filed by the Plaintiff (D.E. #16) should be **DENIED** and the Motion for Summary Judgment filed by the Defendant (D.E. #19) should be **GRANTED**.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) days from service of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Jose E. Martinez, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. Loconte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); R.T.C. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND ORDERED** this 17 day of June, 2008.

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE